5/29/2020 9:57 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-20-002870
Ruben Tamez

Cause No. D-1-GN-20-02870

| | | |
|---|---|---|
| **EPIC TECH, LLC and WINTER SKY, LLC** | § § § | **IN THE DISTRICT COURT** |
| **Plaintiffs,** | § § | |
| **v.** | § § | 261ST **JUDICIAL DISTRICT** |
| **ARNO RESOURCES, LLC** | § § § | |
| **Defendant.** | § § | **TRAVIS COUNTY, TEXAS** |

## PLAINTIFFS' ORIGINAL PETITION

COME NOW Epic Tech, LLC and Winter Sky, LLC (collectively "Plaintiffs"), in the above-styled and numbered cause, and file this Original Petition, complaining of Defendant Arno Resources, LLC ("Arno" or "Defendant"), and would show:

### Introduction

PLAINTIFFS ARE SUCCESSORS AND ASSIGNEES OF THE NOW-DEFUNCT GATEWAY GAMING, LLC ("GATEWAY"). DEFENDANT IS THE ASSIGNEE OF NONPARTY CUSTOM GAMING DESIGN, INC. ("CGD").

IN 2004, GATEWAY AND CGD ENTERED INTO A DEVELOPMENT CONTRACT CONCERNING SOFTWARE. THROUGH THE DEVELOPMENT CONTRACT, CGD DEVELOPED AND DELIVERED CERTAIN SOFTWARE APPLICATIONS TO GATEWAY. THE DEVELOPMENT AGREEMENT TERMINATED ON ITS OWN TERMS AT THE END OF 2005.

IN 2006, GATEWAY AND CGD LITIGATED OVER THE DEVELOPMENT AGREEMENT. THAT LITIGATION RESULTED IN A SETTLEMENT AGREEMENT THAT INCLUDED RECIPROCAL RELEASES ("SETTLEMENT AGREEMENT"). IN THE SETTLEMENT AGREEMENT, CGD RELEASED GATEWAY AND ITS OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, REPRESENTATIVES, AGENTS, EMPLOYEES, SUCCESSORS, AND ASSIGNS, WHICH INCLUDES PLAINTIFFS IN THIS ACTION.

DESPITE THIS, DEFENDANT HERE HAS THREATENED TO BRING CLAIMS BASED ON THE DEVELOPMENT AGREEMENT THAT IT ASSERTS IT PURCHASED FROM CGD. SETTING ASIDE THE FACT THAT THERE HAS BEEN NO VIOLATION OF THE DEVELOPMENT AGREEMENT, AS PART OF THE SETTLEMENT AGREEMENT, ANY SUCH CLAIMS WERE <u>RELEASED</u> OVER THIRTEEN YEARS AGO. ARNO HAS NO RIGHT TO ASSERT ANY CLAIMS BASED ON THE DEVELOPMENT AGREEMENT.

PLAINTIFFS SEEK DECLARATORY RELIEF CONCERNING THE RIGHTS, OBLIGATIONS, AND STATUS OF THE DEVELOPMENT AGREEMENT. PLAINTIFFS ALSO SEEK DECLARATORY RELIEF CONCERNING THE EFFECT AND SCOPE OF THE SETTLEMENT AGREEMENT.

### DISCOVERY CONTROL PLAN

1.     If necessary, Plaintiffs intend to conduct discovery under a Level 2 discovery control plan.

### RULE 47 DISCLOSURE STATEMENT

2.     In accordance with Texas Rule of Civil Procedure 47, Plaintiffs state that the claims asserted herein seek monetary relief of $100,000 or less and non-monetary relief.

### PARTIES

3.     Plaintiff Epic Tech, LLC ("Epic Tech") is a limited liability company organized under the laws of the State of Delaware that has its principal place of business in the State of Georgia.

4.     Plaintiff Winter Sky, LLC ("Winter Sky") is a limited liability company organized under the laws of the State of Delaware that has its principal place of business in the State of Georgia.

5.     Defendant Arno Resources, LLC is a business incorporated under the laws of the State of Texas and maintains its principal place of business at 100 Congress Avenue, Suite 1440 Austin, Texas 78701. Arno may be served with process by serving its registered agent, Giordani, Swanger, Ripp & Jetel, LLP, at 100 Congress Avenue, Suite 1440 Austin, Texas 78701, or wherever it may be found.

### JURISDICTION AND VENUE

6.     The court has jurisdiction over Plaintiffs' claims because the amount in controversy exceeds the minimum jurisdictional limit of this Court. Venue is proper in Travis County, Texas,

under Texas Civil Practice & Remedies §15.002(a), as the county where the Defendant resides at the time the cause of action accrued.

## FACTUAL BACKGROUND

### The Development Agreement

7.      On or about August 13, 2004, Plaintiffs' predecessor, Gateway, entered into the Development Agreement with Defendant's predecessor, CGD.[1] The Development Agreement is a work-for-hire agreement whereby CGD agreed to develop a video gaming system (the "Gateway Gaming System") for a fee of $447,000.00. The Development Agreement further required CGD to develop and complete five separate games, with additional alternate graphics, (the "Gateway Games") for a fee of $408,400.00 for all five games. The total cost of the development and software the subject of the Development Agreement was $855,400.00.

8.      CGD developed the Gateway Gaming System and Gateway Games in installments with anticipated milestones beginning in August 2004 and ending in May 2005. Gateway made payments in installments dependent upon CGD's progress.

9.      The Development Agreement necessarily implicated the creation and transfer of intellectual property. The Development Agreement provides that Gateway would "own the intellectual property rights related to game pay tables, game graphics and the game DLL software, (collectively referred to hereinafter as the 'Game Related Pieces'); including all copyrights, trademarks, patents, and documentation for the Game Related Pieces." As described in the Development Agreement, the Gateway Gaming System was to be the "back office" software that operated the Gateway Games, including a central back office, management terminal, cashier terminal, and a game terminal. Pursuant to the Development Agreement, CGD agreed that "source

---

[1] A true and correct copy of the Development Agreement is attached as Exhibit 1, and incorporated by reference.

code, pay table, flow chart, and complete graphic updates will be provided to Client with each milestone, test release and, at a minimum, no less frequently than 2-week intervals." CGD also granted a "worldwide license to use and modify all source code and documentation for all items exclusive of the Game Related Pieces."

10.     The Development Agreement provides that it will "terminate when all projects set forth in Exhibit A have been completed."

11.     Though CGD delivered late, and delivered defective software, CGD did complete the Gateway Gaming System and the Gateway Games. As required by the Development Agreement, Gateway paid the full amount of $855,400 on or before December 31, 2005 for the completed Gateway Gaming System and the Gateway Games.

12.     Consequently, the Development Agreement terminated on its own terms on or before December 31, 2005 because all projects set forth in its Exhibit A had been completed, and Gateway made all payments required by the Development Agreement.

***The Lawsuit and Settlement Agreement***

13.     On May 22, 2006, CGD filed suit against Gateway and several former CGD employees in a lawsuit captioned *Custom Game Design, Inc. v. Gateway Gaming, Inc., Robert Weatherby, David Dempsey, and Keith Riskey*, Cause No. 06-04909-K, in the 192nd District Court for Dallas County, Texas (the "Texas Action").

14.     On May 31, 2006, Gateway filed suit against CGD in a lawsuit captioned *Gateway Gaming L.L.C. v. Custom Game Design, Inc.*, Civil Action No. 8:06-cv-01649-HMH, in the United States District Court for the District of South Carolina, Greenville Division (the "South Carolina Action").

15.    Both the Texas Action and the South Carolina Action were predicated on alleged violations of the Development Agreement.

16.    Effective April 25, 2007, all parties to both the Texas Action and the South Carolina Action entered into a Settlement Agreement.[2]

17.    The Settlement includes a provision whereby CGD released any claims it had, or may have, concerning the Development Agreement, including release of, among others, Gateway and its officers, shareholders, members, managers, representatives, agents, employees, successors, and assigns:

> 8.    **Release by CGD.**  CGD hereby releases, acquits, and forever discharges and holds harmless Gateway Gaming, L.L.C., Goliath Software, Inc., Robert Weatherby, David Dempsey, and Keith Riskey, their respective officers, shareholders, members, managers, representatives, agents, employees, successors, assigns, trustees and attorneys, from any and all existing, known and unknown, liability, claims, counterclaims, demands, and causes of action for all existing, known, and unknown damages and remedies, which have accrued to them, their affiliates, related companies, successors, and assigns, based upon, arising out of, or relating to the claims made or that could have been made in the Texas Action and South Carolina Action for conduct occurring prior to the effective date of this Agreement, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, which are now recognized by law or which may be created or recognized in the future in any manner, including without limitation by statute, regulation, or judicial decision, for past, present, future, known, and unknown losses, damages, or remedies of any kind.

18.    Despite this broad release, CGD purportedly attempted to sell and assign the claims it released to the Defendant in this action, Arno.

---

[2] A true and correct copy of the Settlement Agreement is attached as Exhibit 2, and incorporated by reference.

*The Assignment Agreement Between CGD and Arno*

19.    Upon information and belief, on or about February 28, 2017, CGD and Arno entered into a Software Assignment Agreement (the "Assignment").[3] The Assignment purportedly transfers "all of GGD's right, title and interest in certain specified intellectual property…."

20.    But in truth, the purpose of the Assignment was to evade CGD's releases contained in the Settlement Agreement. Through the Assignment, CGD also "grants, conveys, and assigns all rights to any claims for misappropriation, violation, infringement or other wrongful act with respect to the Intellectual Property…." Tellingly, the "Intellectual Property" is defined exclusively in terms of the Development Agreement:

---

**Exhibit A**

Non-Exhaustive List of Purchased Intellectual Property

1.    All trademarks, goodwill associated with the trademarks, trade secrets, copyrights, source code, object code, and other intellectual property that resulted from or are associated with the execution or performance of the August 13, 2004 Development Agreement between Gateway Gaming, LLC and CGD[1], aside from those that Gateway Gaming, LLC may own pursuant to section 8 of the Development Agreement.

2.    All of the intellectual property and associated rights that were licensed to Gateway Gaming, LLC pursuant to section 8 of the August 13, 2004 Development Agreement between Gateway Gaming, LLC and CGD.

---

21.    Through the Settlement Agreement, CGD released any claims it may have had concerning any violation of the Development Agreement. Consequently, there were no "rights to any claims" for CGD to assign to Arno through the Assignment.

22.    Despite this, Arno has sent communications to Plaintiffs threatening to bring a suit based on those released claims. On May 13, 2020, counsel for Arno sent a letter to Epic Tech alleging that Epic Tech had engaged in "unauthorized use of certain software that our client's predecessor in interest, Custom Game Design, Inc., licensed to Gateway Gaming, Inc."[4] Arno's

---

[3] A true and correct copy of the Assignment is attached as Exhibit 3, and incorporated by reference.

[4] A true and correct copy of the May 13, 2020 letter, along with its attachment, is attached as Exhibit 4, and

counsel also attached a "draft complaint" purporting to sue Plaintiffs, among others, for misuse of intellectual property that was purchased by Plaintiffs' predecessor through the Development Agreement, using claims that were released through the Settlement Agreement.

## DECLARATORY JUDGMENT

23.    Plaintiffs incorporate by reference the allegations made in the foregoing paragraphs, as if fully set forth herein.

### *The Development Agreement*

24.    The Development Agreement was a valid, enforceable, and binding contract between and among Plaintiffs' predecessor, Gateway, and Defendant's predecessor, CGD.

25.    Plaintiffs are each a "person" entitled to a declaratory judgment under Texas Civil Practice & Remedies Code §§ 37.001, *et seq*. (the Texas Uniform Declaratory Judgment Act), to determine the rights, status, and/or legal obligations of the parties under the terms of the Development Agreement.

26.    An actual and concrete controversy exists among the parties as it relates to their respective rights and obligations under the Development Agreement, and the status of that agreement.

27.    Concerning the Development Agreement, Plaintiffs seek a determination that (a) the Development Agreement terminated under its own terms on or before December 31, 2005, and (b) Gateway purchased and owns the right to all software developed pursuant to the Development Agreement, including all software and source code developed concerning the Gateway Gaming System.

---

incorporated by reference. Arno threatens to sue several terminated entities and uninvolved individuals who are not included here because they have no rights or obligations affected by the Development Agreement or the Settlement Agreement.

28.     A justiciable controversy exists based upon Arno's recent threats of litigation, which allege violations of the Development Agreement, and claim ownership over the intellectual property made the subject of the Development Agreement.

***The Settlement Agreement***

29.     The Settlement Agreement is a valid, enforceable, and binding contract between and among Plaintiffs' predecessor, Gateway, and Defendant's predecessor, CGD, among others.

30.     Plaintiffs are each a "person" entitled to a declaratory judgment under Texas Civil Practice & Remedies Code §§ 37.001, *et seq.* (the Texas Uniform Declaratory Judgment Act), to determine the rights, status, and/or legal obligations of the parties under the terms of the Settlement Agreement.

31.     An actual and concrete controversy exists among the parties as relates to their respective rights, obligations, and scope of the Settlement Agreement, and the legal impact of CGD purportedly assigning released claims to Arno.

32.     In particular, Plaintiffs seek a declaration that the release by CGD of all claims it had, or may have, concerning the Development Agreement, including release of, among others, Gateway and its officers, shareholders, members, managers, representatives, agents, employees, successors, and assigns includes a full and global release of all claims against Plaintiffs based on the Development Agreement. Consequently, CGD had no rights in any such released claims to assign to Arno.

33.     A justiciable controversy exists based upon Arno's recent threats of litigation, which allege violations of the Development Agreement that were released by CGD in the Settlement Agreement over thirteen years ago.

*Attorneys' Fees*

34.    Pursuant to Section 37.009 of the Texas Uniform Declaratory Judgment Act, Plaintiffs seek to recover of their reasonable and necessary attorneys' fees and Court costs incurred in preparing and pursuing this action.

### CONDITIONS PRECEDENT

35.    All conditions precedent for the claims asserted herein have been performed or have occurred.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that Defendant be cited to appear and answer herein and that the Court enter the declaratory judgment requested herein, award attorneys' fees that are equitable and just, and for such other relief to which they may be entitled.

Dated: May 29, 2020                    Respectfully submitted,

/s/ Brant C. Martin
Brant C. Martin
  State Bar No. 24002529
  brant.martin@wickphillips.com
Joseph R. Callister
  State Bar No. 24059054
  joseph.callister@wickphillips.com
Ethan A. Minshull
  State Bar No. 24081045
  ethan.minshull@wickphillips.com
Jessica P. Toumani
  State Bar No. 24081974
  jessica.toumani@wickphillips.com

**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile: (214) 692-6255

**ATTORNEYS FOR PLAINTIFFS**

# EXHIBIT 1

## DEVELOPMENT AGREEMENT

This Development Agreement (the "Agreement") is made effective as of the 13th day of August, 2004 (the "Commencement Date") between Gateway Gaming, LLC ("Client") and Custom Game Design, Inc., 1401 N. Central Expressway, Suite 350, Richardson, Texas 75080 ("CGD")

CGD has a background in computer software architecture, design and programming and is willing to provide services to the Client based on this background.

The Client desires to have services provided by CGD.

Therefore, the parties agree as follows:

1. **DESCRIPTION OF SERVICES.** Beginning on the Commencement Date, CGD will provide the following services, (collectively, the "Services") to Client: manage, plan, architect, design, and code the video gaming systems as described in Exhibit A attached hereto and incorporated hereby.

2. **PERFORMANCE OF SERVICES.** The manner in which the Services are to be performed and the specific hours to be worked by CGD shall be determined by CGD. CGD will provide such technical support, remote or on-site, as reasonably requested by the Client in accordance with the rate schedule set forth in Exhibit A. If Client directly or indirectly modifies, alters, adds, or in any way changes any software, pay table, or any other component of the video gaming system delivered hereunder to Client by CGD (collectively referred to hereinafter as "Deliverables"), CGD will not be held liable for any resultant damage to the Deliverables.

   CGD warrants and represents that the Services performed for the Client will be CGD's original work and that CGD will not copy the works of others or intentionally infringe the intellectual property rights of any other person or business entity, that CGD has full authority to enter into this Agreement and perform the obligations hereunder, that all designs and products created under this Agreement shall substantially comply with the design requirements as outlined by the Client in this Agreement, and that software developed for the Client will be free from traps or other facilities designed to interrupt normal operation. CGD shall indemnify and hold the Client harmless from any and all claims arising from the intentional infringement of the existing intellectual property rights of others in rendering the Services.

3. **PAYMENT.** The Client will pay a fee to CGD for Services in accordance with the schedule contained in Exhibit A. Each project will start when the initial payment is received. Subsequent fees will be invoiced at the completion of each milestone. The completion of beta shall be mutually agreed upon in writing by CGD and the Client, and any such mutual agreement may not be unreasonably withheld, delayed or conditioned by either party hereto. If the Client does not respond with a software error within any 30 day period after a project has been delivered for beta, the Client will be invoiced for the applicable milestone and payment will be due. Expenses incurred by CGD in the performance of the Services, as outlined in Section 4, will be invoiced to the Client bi-weekly. Invoices shall be paid to CGD no later than 15 days after the invoice date. Late

charges of 12% per annum will be charged on any outstanding amounts if payment is not received within 15 days of the invoice date.

4.    **EXPENSE REIMBURSEMENT.** CGD shall be entitled to timely reimbursement from the Client for the following expenses related to the Services:

- Travel expenses including transportation, lodging, and meals.
- Software specific to the Client's project.
- Hardware specific to the Client's project.
- Any reasonable and necessary expenses.

All expenses must be approved by the Client. Any expenses exceeding $3000 must be approved in writing. These expenses are separate from the software fee described in Exhibit A.

5.    **TERMINATION.** This agreement may be terminated by CGD if any payment due from the Client has not been received within 45 days after the invoice date. Client may terminate this agreement at its sole discretion upon death, disability or dissociation of David Hampe from CGD. Except as expressly set forth in the foregoing sentences, this Agreement may be terminated by either party for a material breach hereof if such breach remains uncured by the breaching party for a period of 30 or more days from the date notice of same was delivered, unless the breaching party is diligently pursuing the cure of such breach and cures the same within the successive 30 day period. Termination by CGD will not relieve the Client of payments that are due as of the termination date. If a termination of this Agreement does not occur at a milestone, the Client is responsible for all payments up to and including the milestone currently in progress, in accordance with Section 3 of this Agreement. This Agreement will in any event terminate when all projects set forth in Exhibit A have been completed.

6.    **EMPLOYEE SOLICITATION.** If Client (or any related entity thereto or principal thereof) should solicit for contract or hire any employee of CGD or ex-employee of CGD within 180 days after employment by CGD directly or through a third-party, CGD may terminate this Agreement at its sole option and shall be entitled to a payment equal to forty percent (40%) of the annualized salary offered to said employee by the Client.

7.    **RELATIONSHIP OF PARTIES.** Nothing herein contained, shall create between the parties hereto, or be relied upon by others as creating, any relationship of employee/employer or partnership, association, joint venture, or otherwise.

8.    **INTELLECTUAL PROPERTY.** The Client shall own the intellectual property rights related to game pay tables, game graphics and the game DLL software. (collectively referred to hereinafter as the "Game Related Pieces"); including all copyrights, trademarks, patents, and documentation for the Game Related Pieces. The Client will also receive a worldwide license to use and modify all source code and documentation for all items exclusive of the Game Related Pieces.

As consideration for the above referenced license, Client grants CGD the right to utilize representations of the game screens related to the Game Related Pieces for use in CGD's portfolio in whatever media form CGD deems, and Client authorizes CGD to use Client's name for marketing and promotional purposes as well as for any applicable copyright notices requested by Client.

In consideration of the Client agreeing to engage CGD hereunder, CGD agrees that during the term of this Agreement, it shall not create any Class II gaming device for any third party to be used in North America. CGD also agrees not to develop any Class II software for 90 days after the completion of this contract, with the exception of the Client.

It is anticipated that source code, pay table, flow chart, and complete graphic updates will be provided to Client with each milestone, test release and, at a minimum, no less frequently than 2-week intervals.

9. **LIABILITY.** With regard to the Services to be performed by CGD pursuant to the terms of this agreement, CGD shall not be liable to the Client, or to anyone who may claim any right due to any relationship with the Client, for any acts or omissions in the performance of the Services on the part of CGD or on the part of the agents or employees of CGD, except when said acts or omissions of CGD are due to willful misconduct or gross negligence. The Client shall hold CGD free and harmless from any obligations, costs, claims, judgments, attorneys' fees, and attachments arising from or growing out of the Services rendered to the Client pursuant to the terms of this agreement, or in any way connected with the rendering of the Services except when the same shall arise due to the willful misconduct or gross negligence of CGD and CGD is adjudged to be guilty of willful misconduct or gross negligence by a court of competent jurisdiction.

Neither party shall be liable hereunder for special, indirect, consequential or incidental losses or damages of any kind or nature whatsoever, including but not limited to lost profits or lost savings, regardless of whether arising from breach of contract, warranty, tort, strict liability or otherwise, even if advised of the possibility of such loss or damage, or if such loss or damage could have been reasonably foreseen.

The Client's liability hereunder shall not exceed the total amount paid for the Services listed on Exhibit A under which such liability arises. CGD's liability hereunder shall not exceed the total amount earned under this Agreement as listed on Exhibit A under which such liability arises. A party's liability shall not be so limited with respect to injuries to persons or damage to tangible property arising out of the gross negligence or willful misconduct of such party or its employees.

10. **CONFIDENTIALITY.** Confidential information is information that relates to the other party's research, development, trade secrets, or business affairs, but does not include information which is generally known to the public or easily ascertainable by nonparties of ordinary skill in computer design and programming.

Notwithstanding the rights granted by Client to CGD in Section 8 above, CGD and the Client hereby acknowledge that during the performance of this Agreement, they may learn or receive confidential information related to the other party and therefore CGD and Client hereby confirm that all such information relating to the other party will be kept confidential. CGD reserves the right to divulge such information to support staff or associates to the extent necessary to enable CGD to perform the Services.

11. **CONFIDENTIALITY AND WARRANTY AFTER TERMINTION.** The confidentiality and warranty provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

12. **RETURN OF RECORDS.** Upon completion or termination of this Agreement, CGD shall coordinate with Client regarding the return and/or destruction of all records, notes, data, memoranda, models, and equipment of any nature that are in CGD's possession or under CGD's control and that are the Client's property or relate to the Game Related Pieces.

13. **NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage prepaid, addressed as follows:

**If for the Client:**
Gateway Gaming, LLC
Leslie Caldwell
103 Green Crest Way
Easley, SC 29642

**If for CGD:**
Custom Game Design, Inc.
David Hampe
1401 N. Central Expressway
Suite 350
Richardson, Texas 75080

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

14. **ENTIRE AGREEMENT.** This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

15. **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by both parties.

16. **SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or

unenforceable, but that by limiting such provision it would become valid and enforceable then such provision shall be deemed to be written, construed, and enforced as so limited.

17.    **WAIVER OF CONTRACTUAL RIGHT.**  The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

18.    **APPLICABLE LAW.**  This Agreement shall be governed by the Laws of the State of South Carolina

19.    **ASSIGNMENT.**  This Agreement may not be assigned by either party without the written consent of the other party hereto.

20.    **WARRANTY.**  For a period of one year after the completion of this Agreement CGD will continue to supply support and fixes as requested by the Client in accordance with the rate schedule set forth in Exhibit A.  Except and to the extent otherwise expressly provided herein, there are no other warranties, express or implied, including, but not limited to, any warranties of merchantability or fitness for any particular purpose.

**EXECUTED** as of the date first written above.

**Client:**
Gateway Gaming, LLC,
a South Carolina limited liability company

By: _____
              (Signature)

_Leslie D. Calwell    President_
              (Printed Name & Title)

**CGD:**
Custom Game Design, Inc.,
a Texas corporation

By: _____

David Hampe, President

### *EXHIBIT A*

*Schedule and Cost of Work for System, Games, and Support*

**Schedule**

August 2004
- Start of Gaming System ($103,750)

September 2004
- Start Game 1: 8-liner at 95% ($18,200)
- Approval of Game 1: 8-liner at 95% ($18,200)

October 2004
- First milestone for Gaming System ($103,750)
- Start 8-liner 93% numbers ($8,400)
- Start Game 2: alternate graphics 8-liner ($12,000)

November 2004
- Approval of Game 2: alternate graphics 8-liner ($12,000)
- Complete 8-liner 93% numbers ($8,400)

December 2004
- Start of Game 3: 5-liner at 95% ($17,000)
- Approval of Game 3: 5-liner at 95% ($17,000)
- Start 5-liner 93% numbers ($6,000)
- Complete 5-liner 93% numbers (6,000)

January 2005
- Start Game 4: alternate graphics 5-liner ($12,000)
- Approval of Game 2: alternate graphics 5-liner ($12,000)

February 2005
- Gaming System enters beta ($103,750)
- Game 1 enters beta ($18,200)

March 2005
- Gaming System completes beta ($103,750) + ($32,000)
- Game 1 completes beta ($18,200) + ($11,200)
- Game 2 enters beta ($12,000)
- Game 3 enters beta ($17,000)
- Start of Game 5: 9-liner at 95% ($18,600)
- Approval of Game 5: 9-liner at 95% ($18,600)

April 2005
- Game 2 completes beta ($12,000) + ($8,200)
- Game 3 completes beta ($17,000) + ($11,200)
- Game 4 enters beta ($12,000)
- Game 5 enters beta ($18,600)
- Start 9-liner 93% numbers ($9,200)
- Complete 9-liner 93% numbers ($9,200)

May 2005
- Game 4 completes beta ($12,000) + ($8,200)
- Game 5 completes beta ($18,600) + ($11,200)

## Gateway Gaming System

The Gateway Gaming System will consist of a Central Back Office, Management Terminal, Cashier Terminal, and a Game Terminal. The system will have features comparable to competitive systems in the field. Wide Area progressives, Wide Area Game Play, Card Reader, and Mechanical Slots are not included in this quote.

| | |
|---|---|
| Gaming System | $321,000 |
| Financial Collection Server | $16,000 |
| Max Bet Selectable | $24,000 |
| Multi-Denomination | $20,000 |
| 2 Methods for Single Players | $10,000 |
| Ticket In, Ticket Out | $20,000 |
| 2 LCDs | $4,000 |
| Beta Testing | $32,000 |
| **TOTAL** | $447,000 |

Compensation will be paid according to the following schedule:

| | |
|---|---|
| To be paid upon initiation of project: | $103,750 |
| To be paid at first milestone: | $103,750 |
| To be paid at second milestone: | $103,750 |
| To be paid at second milestone: | $135,750 |

The milestones are defined as follows:

First Milestone: Demonstration of game with new graphics and casino engines.

Second Milestone: Start of Beta.

Third Milestone: Completion of Beta testing.

**Games**

| | |
|---|---|
| 8 Liner at 95% | $72,800 |
| 8 Liner 93% Payout | $16,800 |
| 8 Liner Alternate Graphics | $48,000 |
| 5 Liner at 95% | $68,000 |
| 5 Liner 93% Payout | $12,000 |
| 5 Liner Alternate Graphics | $48,000 |
| 9 Liner at 95% | $74,400 |
| 9 Liner 93% Payout | $18,400 |
| Beta Testing – 5 Games | $50,000 |
| | ------------ |
| **TOTAL** | $408,400 |

There are four payments for new game projects and alternative graphics projects. These payments occur at the following milestones: start, game design approval, beta, and release. All other projects have two payments. These payments occur at the following milestones: start and release.

*Support and Ad Hoc Projects*

Support services and ad hoc projects, including but not limited to test programs, device drivers, feature requests, field support, marketing support and manufacturing support will be charged according to the following schedule of rates:

Monday – Friday 9AM – 7PM Central Time     $100.00 / hour
(Normal Business Hours)

Monday – Friday 12AM – 9AM Central Time
Monday – Friday 7PM – 12AM Central Time
Saturday
Sunday                                     $150.00 / hour

On-Site Support                            $150.00 / hour

All support and ad hoc work will be done during normal business hours at the CGD office unless after-hours or on-site support is requested by the Client in advance and expenses related thereto shall be reimbursed in accordance with Section 4 of the Agreement.

Client may have further projects that are not included in the contract, but can be quoted and initiated at a mutually agreed upon price from CGD.

# EXHIBIT 2

# DAVIS RAWLINS, P.C.



May 4, 2007

James M. Griffin, Esq.                                    **VIA CERTIFIED MAIL**
THE LAW OFFICES OF JAMES MIXON GRIFFIN
P.O. Box 999
Columbia, South Carolina, 29202

Craig M. Price, Esq.                                      **VIA CERTIFIED MAIL**
HAMMERLE FINLEY
2220 San Jacinto Blvd., Suite 200
Denton, Texas 76205

> Re:    Cause No. 06-04909-K; *Custom Game Design, Inc. vs. Gateway Gaming, Inc., et al.*

> Re:    NO. 8:06-CV-01649-HMH; *Gateway Gaming, LLC v. Custom Game Design, Inc.*

Dear Jim and Craig:

Enclosed is a fully executed copy of the Settlement Agreement in connection with the above-entitled and numbered cases.

I have signed and enclosed the Agreed Motion for Dismissal With Prejudice and Order granting same for filing in Cause No. 06-04909-K.  Craig, please sign and file the motion and enclosed order.

In addition, Jim please file the Joint Stipulation of Dismissal and Order granting same in case No. 8:06-cv-01649 pursuant to paragraph 2 of the settlement agreement.

Sincerely,

*Karen McCloud*

Karen McCloud

cc:    Dave Hampe
       Mason Goldsmith

---

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and among Custom Game Design, Inc. ("CGD") and Gateway Gaming L.L.C. ("Gateway"), Robert Weatherby ("Weatherby"), David Dempsey ("Dempsey"), and Keith Riskey ("Riskey") (collectively, "the Parties") and shall be deemed entered into as of the date of signature of the last party or party representative to sign the Agreement.

## **RECITALS**

WHEREAS, on May 22, 2006, CGD filed suit against Gateway, Weatherby, Dempsey, and Riskey in a lawsuit captioned *Custom Game Design, Inc. v. Gateway Gaming, Inc., Robert Weatherby, David Dempsey, and Keith Riskey*, Cause No. 06-04909-K, in the 192nd District Court for Dallas County, Texas (the "Texas Action");

WHEREAS, on May 31, 2006, Gateway filed suit against CGD in a lawsuit captioned *Gateway Gaming L.L.C. v. Custom Game Design, Inc.*, Civil Action No. 8:06-cv-01649-HMH, in the United States District Court for the District of South Carolina, Greenville Division (the "South Carolina Action");

WHEREAS, the Parties wish to settle all matters currently in controversy between them without the time, trouble, expense, and uncertainty of further litigation;

WHEREAS, the Parties wish to dismiss with prejudice all claims between them that were or could have been asserted in the Texas Action and South Carolina Action; and

NOW, THEREFORE, in consideration of the foregoing recitals and in consideration of the covenants and other promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## TERMS OF AGREEMENT

1.    **Full Settlement.**    The Parties do hereby fully and finally settle all disputes, claims, counterclaims, causes of action that were or could have been asserted as a claim, counterclaim, or defense in the Texas Action and/or South Carolina Action by any of the Parties or that are based on any action or omission occurring between them prior to the effective date of the Agreement.

2.    **Dismissal of Actions.**    The Parties agree to dismiss the Texas Action and South Carolina Action with prejudice within seven (7) calendar days after the effective date of the Agreement.  CGD shall file an Agreed Motion to Dismiss With Prejudice and Agreed Order of Dismissal in the form attached as Exhibit A in the 192nd District Court of Dallas County, Texas, in Cause No. 06-04909-K, styled *Custom Game Design, Inc. v. Gateway Gaming, Inc., Robert Weatherby, David Dempsey, and Keith Riskey.*    Gateway shall file a Joint Stipulation of Dismissal with Prejudice and Agreed Order of Dismissal in the form attached as Exhibit B in the United States District Court for the District of South Carolina, Greenville Division, in Civil Action No. 8:06-cv-01649-HMH, styled *Gateway Gaming L.L.C.  v. Custom Game Design, Inc.*

3.    **Release by Gateway.**    Gateway hereby releases, acquits, and forever discharges and holds harmless Custom Game Design, Inc., its officers, shareholders, members, managers, representatives, agents, employees, successors, assigns, trustees and attorneys from any and all existing, known and unknown, liability, claims, counterclaims, demands, and causes of action for all existing, known, and unknown damages and remedies, which have accrued to Gateway, its affiliates, related companies, successors, and assigns, based upon, arising out of, or relating to the claims made or that could have been made in the Texas Action and South Carolina Action for conduct occurring prior to the effective date of this Agreement, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising

under or by virtue of any statute or regulation, which are now recognized by law or which may be created or recognized in the future in any manner, including without limitation by statute, regulation, or judicial decision, for past, present, future, known, and unknown losses, damages, or remedies of any kind.

4.    **Release by Weatherby.**    Weatherby hereby releases, acquits, and forever discharges and holds harmless Custom Game Design, Inc., its officers, shareholders, members, managers, representatives, agents, employees, successors, assigns, trustees and attorneys from any and all existing, known and unknown, liability, claims, counterclaims, demands, and causes of action for all existing, known, and unknown damages and remedies, which have accrued to Weatherby, his heir, successors, and assigns, based upon, arising out of, or relating to the claims made or that could have been made in the Texas Action and South Carolina Action for conduct occurring prior to the effective date of this Agreement, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, which are now recognized by law or which may be created or recognized in the future in any manner, including without limitation by statute, regulation, or judicial decision, for past, present, future, known, and unknown losses, damages, or remedies of any kind.

5.    **Release by Dempsey.**  Dempsey hereby releases, acquits, and forever discharges and holds harmless Custom Game Design, Inc., its officers, shareholders, members, managers, representatives, agents, employees, successors, assigns, trustees and attorneys from any and all existing, known and unknown, liability, claims, counterclaims, demands, and causes of action for all existing, known, and unknown damages and remedies, which have accrued to Dempsey, his heir, successors, and assigns, based upon, arising out of, or relating to the claims made or that could have been made in the Texas Action and South Carolina Action for conduct occurring

prior to the effective date of this Agreement, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, which are now recognized by law or which may be created or recognized in the future in any manner, including without limitation by statute, regulation, or judicial decision, for past, present, future, known, and unknown losses, damages, or remedies of any kind.

6.    **Release by Riskey.**    Riskey hereby releases, acquits, and forever discharges and holds harmless Custom Game Design, Inc., its officers, shareholders, members, managers, representatives, agents, employees, successors, assigns, trustees and attorneys from any and all existing, known and unknown, liability, claims, counterclaims, demands, and causes of action for all existing, known, and unknown damages and remedies, which have accrued to Riskey, his heir, successors, and assigns, based upon, arising out of, or relating to the claims made or that could have been made in the Texas Action and South Carolina Action for conduct occurring prior to the effective date of this Agreement, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, which are now recognized by law or which may be created or recognized in the future in any manner, including without limitation by statute, regulation, or judicial decision, for past, present, future, known, and unknown losses, damages, or remedies of any kind.

7.    **Release by Goliath Software, Inc.**    Goliath Software, Inc. ("Goliath") hereby releases, acquits, and forever discharges and holds harmless Custom Game Design, Inc., its officers, shareholders, members, managers, representatives, agents, employees, successors, assigns, trustees and attorneys from any and all existing, known and unknown, liability, claims, counterclaims, demands, and causes of action for all existing, known, and unknown damages and

remedies, which have accrued to Gateway, its affiliates, related companies, successors, and assigns, based upon, arising out of, or relating to the claims made or that could have been made in the Texas Action and South Carolina Action for conduct occurring prior to the effective date of this Agreement, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, which are now recognized by law or which may be created or recognized in the future in any manner, including without limitation by statute, regulation, or judicial decision, for past, present, future, known, and unknown losses, damages, or remedies of any kind.

8.    **Release by CGD.**  CGD hereby releases, acquits, and forever discharges and holds harmless Gateway Gaming, L.L.C., Goliath Software, Inc., Robert Weatherby, David Dempsey, and Keith Riskey, their respective officers, shareholders, members, managers, representatives, agents, employees, successors, assigns, trustees and attorneys, from any and all existing, known and unknown, liability, claims, counterclaims, demands, and causes of action for all existing, known, and unknown damages and remedies, which have accrued to them, their affiliates, related companies, successors, and assigns, based upon, arising out of, or relating to the claims made or that could have been made in the Texas Action and South Carolina Action for conduct occurring prior to the effective date of this Agreement, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, which are now recognized by law or which may be created or recognized in the future in any manner, including without limitation by statute, regulation, or judicial decision, for past, present, future, known, and unknown losses, damages, or remedies of any kind.

9.    **Firehouse.**  Custom Game Design, Inc. retains ownership of and all rights to the Firehouse game and numbers. Gateway,    Goliath,    Weatherby,    Dempsey,    and    Riskey

acknowledge that they do not now or since leaving CGD have in their possession any version of the Firehouse numbers finished or not finished.

10.    **Gateway Equipment.**  CGD agrees to return to Gateway the following seven pieces of equipment and any other equipment that CGD can identify as belonging to Gateway by the date this Agreement is entered:

| 1. | Cashier Terminal | Barcode Reader | Symbol LS2208 |
|---|---|---|---|
| 2. | Game Server | Software | Windows Small Business Server 2003 |
| 3. | Cashier Terminal | Receipt Printer | Epson TM-T88III |
| 4. | Cashier Terminal | Cash Drawer | APG Series 4000 |
| 5. | Game Server | Computer | Dell PowerEdge2600 |
| 6. | Gateway Games Cabinets | | |
| 7. | Multiple power supplies | | |

The Parties agree that Gateway takes the equipment **"AS IS,"** without any warranties, representations, or liabilities of any kind.

11.    **Consideration Acknowledged.**  The Parties acknowledge that the covenants contained in this Settlement Agreement provide good and sufficient consideration for every promise, duty, release, obligation, and right contained herein.

12.    **No Admission of Liability.**  The Parties acknowledge that this Agreement is made to avoid further costs and uncertainties of litigation.  The Parties understand and agree that the terms of this Agreement are contractual and not mere recitals, that this is a compromise of disputed claims, and that nothing contained herein shall be construed as an admission of any liability whatsoever by or on behalf of CGD, Gateway, Weatherby, Dempsey, or Riskey, all such liability being expressly denied.

13.  **Attorney's Fees.**  The Parties shall bear their own attorney's fees, costs and expenses in connection with the Texas Action and South Carolina Action.

14.  **Independent Judgment.**  The undersigned represent and warrant that they fully understand the terms of this Agreement, that they have discussed it fully with counsel of their choosing, that they have acted on their own independent judgment, and that neither is relying on any representations of the other in executing this Agreement, whether in the form of the existence or absence of a material fact, or otherwise.

15.  **Entirety and Amendments.**  This Agreement with attachments embodies the entire agreement between and among the Parties, and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended, changed or modified only by an instrument in writing executed jointly by the Parties, and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

16.  **Further Assurances.**  The Parties agree, represent and warrant that they are the sole and true owners of, and have not previously assigned, transferred or granted or purported to assign, transfer, or grant any of the claims, demand, causes of action, suits, controversies, liabilities or obligations released, assigned or transferred by this Agreement.

17.  **Parties Bound.**  This Agreement shall be binding upon and inure to the benefit of the Parties and all persons released in Paragraphs 3-8 and their heirs, successors and assigns.

18.  **Attorneys' Fees.**  The Parties shall bear their own attorneys' fees, costs and expenses in connection with the Texas Action and the South Carolina Action.  In connection with any motion or other proceedings that may be filed to enforce the terms of this Agreement, however, the prevailing party in connection with such motion or other proceeding shall be entitled to recover its costs, including reasonable and necessary attorneys' fees and expenses.

19.    **Multiple Counterparts.**  This Agreement may be executed in counterparts each of which shall constitute an original.

20.    **Notices.**  All Notices due under this Agreement shall be served by certified mail, return receipt requested to the following addresses:

> Custom Game Design, Inc.
> c/o David Hampe
> 5055 W Park Blvd.
> Suite 550
> Plano, TX 75093
>
> Gateway Gaming, L.L.C.
> c/o Michael Caldwell
> 1243 Piedmont Highway
> Piedmont, South Carolina 29689
>
> Robert Weatherby
> 12240 Henderson Trail
> Celina, Texas 75009
>
> David Dempsey
> 913 Madison Circle
> Lewisville, Texas 75067
>
> Keith Riskey
> 3827 Holland Avenue, #B
> Dallas, Texas 75219

**IN WITNESS WHEREOF**, the Parties have executed this Release on the last day acknowledged below.

Custom Game Design, Inc.

By:    _____
*Signature of Authorized Party Representative*

Printed Name: David Hampe
Title:   President
Date:    _____4/25/07_____

Goliath Software, Inc.

By: _____

*Signature of Authorized Party Representative*

Printed Name:  Bob Mosely

Title:  President

Date:  ___4/24/07_____

Gateway Gaming L.L.C.

By: _Michael Caldwell_
Signature of Authorized Party Representative

Printed Name:  Michael Caldwell

Title:  Chief Executive Officer

Date: _3/28/07_

By: _____
Robert Weatherby

Date: _____

By: _____
David Dempsey

Date: _____

By: _____
Keith Riskey

Date: _____

APPROVED AS TO FORM AND SUBSTANCE:

_____
James E. Davis
DAVIS RAWLINS P.C.
3010 LBJ Freeway
Suite 1200
Dallas, TX 75234

Attorney for Custom Game Design, Inc. in Texas Action

Gateway Gaming L.L.C.

By:  _Michael Caldwell_
*Signature of Authorized Party Representative*

Printed Name:  Michael Caldwell

Title:  Chief Executive Officer

Date:  _3/28/07_


By:  _Robert Weatherby_
Robert Weatherby

Date:  _04/10/07_


By:  _David Dempsey_
David Dempsey

Date:  _4-17-07_


By:  _____
Keith Riskey

Date:  _____


APPROVED AS TO FORM AND SUBSTANCE:


_____
James E. Davis
DAVIS RAWLINS P.C.
3010 LBJ Freeway
Suite 1200
Dallas, TX 75234

Attorney for Custom Game Design, Inc. in Texas Action

Gateway Gaming L.L.C.

By: _Michael Caldwell_
*Signature of Authorized Party Representative*

Printed Name:  Michael Caldwell

Title:  Chief Executive Officer

Date: _3/28/07_


By: _____
    Robert Weatherby

Date: _____


By: _____
    David Dempsey

Date: _____


By: _____
    Keith Riskey

Date: _4/12/07_


APPROVED AS TO FORM AND SUBSTANCE:


_____
James E. Davis
DAVIS RAWLINS P.C.
3010 LBJ Freeway
Suite 1200
Dallas, TX 75234

Attorney for Custom Game Design, Inc. in Texas Action

Gateway Gaming L.L.C.

By: _____
*Signature of Authorized Party Representative*

Printed Name: Michael Caldwell

Title: Chief Executive Officer

Date: _____

By: _____
Robert Weatherby

Date: _____

By: _____
David Dempsey

Date: _____

By: _____
Keith Riskey

Date: _____

APPROVED AS TO FORM AND SUBSTANCE:

James E. Davis
DAVIS RAWLINS P.C.
3010 LBJ Freeway
Suite 1200
Dallas, TX 75234

Attorney for Custom Game Design, Inc. in Texas Action

_____

Mason A. Goldsmith, Jr.
ELMORE & WALL, P.A.
301 North Main Street, Suite 2000
Greenville, South Carolina 29601

Attorney for Custom Game Design, Inc. in South Carolina Action

_____

Richard A. Harpootlian
P.O. Box 1090
Columbia, South Carolina, 29202

Attorney for Gateway Gaming, L.L.C. in South Carolina Action

_____

James M. Griffin
THE LAW OFFICES OF JAMES MIXON GRIFFIN
P.O. Box 999
Columbia, South Carolina, 29202

Attorney for Gateway Gaming, L.L.C. in South Carolina Action

_____

Virgina L. Hammerle
Craig M. Price
HAMMERLE FINLEY
2220 San Jacinto Blvd., Suite 200
Denton, Texas 76205

Attorneys for Gateway Gaming, L.L.C., Robert Weatherby,
David Dempsey, and Keith Riskey in Texas Action

Mason A. Goldsmith, Jr.
ELMORE & WALL, P.A.
301 North Main Street, Suite 2000
Greenville, South Carolina 29601

Attorney for Custom Game Design, Inc. in South Carolina Action

Richard A. Harpootlian
P.O. Box 1090
Columbia, South Carolina, 29202

Attorney for Gateway Gaming, L.L.C. in South Carolina Action

James M. Griffin
THE LAW OFFICES OF JAMES MIXON GRIFFIN
P.O. Box 999
Columbia, South Carolina, 29202

Attorney for Gateway Gaming, L.L.C. in South Carolina Action

Virgina L. Hammerle
Craig M. Price
HAMMERLE FINLEY
2220 San Jacinto Blvd., Suite 200
Denton, Texas 76205

Attorneys for Gateway Gaming, L.L.C., Robert Weatherby,
David Dempsey, and Keith Riskey in Texas Action

## CAUSE NO. 06-04909-K

| | | |
|---|---|---|
| CUSTOM GAME DESIGN, INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| GATEWAY GAMING, INC., ROBERT | § | |
| WEATHERBY, DAVID DEMPSEY, AND | § | |
| KEITH RISKEY | § | 192ND JUDICIAL DISTRICT |

---

### AGREED MOTION FOR DISMISSAL WITH PREJUDICE

---

Plaintiff Custom Game Design, Inc. ("CGD") and Defendants Gateway Gaming, L.L.C., Robert Weatherby, David Dempsey, and Keith Riskey (collectively, "Defendants") announce to the Court that the parties have resolved all matters between them and request that this Court dismiss the claims asserted in this matter in their entirety with prejudice.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff and Defendants request that the Court enter an Order dismissing all causes of action with prejudice to the refiling of same and that all costs are to be paid by the parties incurring same.

Dated: May 4, 2007



EXHIBIT
A

Respectfully submitted:

---

**JAMES E. DAVIS**
State Bar No. 05504200
**KAREN D. MCCLOUD**
State Bar No. 24013125
**DAVIS RAWLINS, PC**
3010 LBJ Freeway, Suite 1200
Dallas, Texas 75234
(972) 919-6155 (Telephone)
(972) 919-6195 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

---

**VIRGINA N. HAMMERLE**
State Bar No. 14907600
**CRAIG M. PRICE**
State Bar No. 16284170
**HAMMERLE FINLEY**
220 San Jacinto Blvd., Suite 200
Denton, Texas 76205
(940) 383-9300 (Telephone)
(972) 434-4500 (Metro)
(940)383-8000 (Fax)

**ATTORNEYS FOR DEFENDANTS**

CAUSE NO. 06-04909-K

| | | |
|---|---|---|
| CUSTOM GAME DESIGN, INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| GATEWAY GAMING, INC., ROBERT | § | |
| WEATHERBY, DAVID DEMPSEY, AND | § | |
| KEITH RISKEY | § | 192ND JUDICIAL DISTRICT |

## AGREED ORDER OF DISMISSAL WITH PREJUDICE

On this day the Court considered the Agreed Motion for Dismissal in the above-styled cause of action. In the Agreed Motion for Dismissal, Plaintiff and Defendants announced that the matters in controversy in this action between them have been resolved and settlement. Accordingly, Plaintiff and Defendants move that the causes of action and claims asserted in the above-styled and numbered cause of action be dismissed with prejudice as to the refilling of same.

IT IS HEREBY ORDERED that all claims between the parties in the above-styled cause of action be, and hereby are, dismissed with prejudice as to the refiling in any form.

All costs are to be paid by the party incurring same.

SO ORDERED on _____, 2007.


_____
Judge Craig Smith

Agreed as to form and entry:

_____
Karen McCloud
Attorney for Plaintiff


_____
Craig Price
Attorney for Defendants

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### GREENVILLE DIVISION

| | | |
|---|---|---|
| GATEWAY GAMING, L.L.C. | § | NO. 8:06-CV-01649-HMH |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| CUSTOM GAME DESIGN, INC. | § | |
| | § | |
| Defendant. | § | |

## JOINT STIPULATION OF DISMISSAL

Plaintiff Gateway Gaming, L.L.C. and Defendant Custom Game Design, Inc. file this stipulation of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii).

The parties have resolved all matters between them and therefore, stipulate to the dismissal of their respective claims and counterclaims against one another.

This dismissal is with prejudice.

All costs are to be paid by the party incurring same.

WHEREFORE, PREMISES CONSIDERED, Plaintiff and Defendant request that the Court enter an Order dismissing all claims and counterclaims asserted in this lawsuit with prejudice to the refiling of same.

JOINT STIPULATION OF DISMISSAL                                                    PAGE 1



Respectfully submitted,

By:  *s/ Richard A. Harpootlian*
Richard A. Harpootlian
Fed. I.D. No. 1730
P.O.Box 1090
Columbia, South Carolina 29202
(803) 252-4848


By:  *s/ James M. Griffin*
James M. Griffin
Fed. I.D. No. 1053
P.O.Box 1090
Columbia, South Carolina 29202
(803) 744-0800

## ATTORNEYS FOR PLAINTIFF


By:  *s/Mason A. Goldsmith, Jr.*
Mason A. Goldsmith, Jr.
Fed. I.D. No. 7029
ELMORE & WALL, P.A.
301 North Main Street, Suite 2000
Greenville, South Carolina 29601
Telephone: (864) 255-9500
Fax: (864) 255-9505

## ATTORNEY FOR DEFENDANT

**Of Counsel for Defendant:**
**JAMES E. DAVIS**
Texas State Bar No. 05504200
**DAVIS RAWLINS, PC**
3010 LBJ Freeway, Suite 1200
Dallas, Texas 75243
(972) 919-6155 – Telephone
(972) 919-6195 – Facsimile

Greenville, South Carolina
**JOINT STIPULATION OF DISMISSAL**                              PAGE 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| GATEWAY GAMING, L.L.C. | § | NO. 8:06-CV-01649-HMH |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| CUSTOM GAME DESIGN, INC. | § | |
| | § | |
| Defendant. | § | |

---

## AGREED ORDER OF DISMISSAL

---

Came on for consideration Plaintiff and Defendant's Joint Stipulation of Dismissal.

IT IS HEREBY ORDERED that all claims and counterclaims between the parties in the above-styled civil action be, and hereby are, dismissed with prejudice as to the refiling in any form.

All costs are to be paid by the party incurring same.

SO ORDERED on _____, 2007.


_____
Henry M. Herlong, Jr.
U.S. District Judge


AGREED ORDER OF DISMISSAL                                            PAGE 1

AGREED:

_/s/ Richard A. Harpootlian_
Richard A. Harpootlian
Attorney for Gateway Gaming, L.L.C.

_/s/ James Griffin_
James Griffin
Attorney for Gateway Gaming, L.L.C.

_/s/ Mason A. Goldsmith, Jr._
Mason A. Goldsmith, Jr.
Attorney for Custom Game Design, Inc.

# Exhibit 3

# SOFTWARE ASSIGNMENT AGREEMENT

THIS SOFTWARE ASSIGNMENT AGREEMENT (this "Agreement"), dated as of February 28, 2017, is entered into by and between Arno Resources, LLC, a Texas limited liability company ("Arno"), and Custom Game Design, Inc. a Texas corporation ("CGD").

## RECITAL

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, CGD desires to assign to Arno all of GGD's right, title and interest in certain specified intellectual property, except those rights which are expressly reserved by CGD as provided in Section 1.02 herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## ASSIGNMENT OF INTELLECTUAL PROPERTY

Section 1.01   Assignment of Intellectual Property.   CGD hereby grants, conveys, and assigns to Arno all rights, title and interest to the intellectual property described in the attached Exhibit A (collectively, the "Intellectual Property"). CGD also hereby grants, conveys, and assigns all rights to any claims for misappropriation, violation, infringement or other wrongful act with respect to the Intellectual Property, regardless of whether such misappropriation, violation, infringement or other wrongful act occurred before or after the date of this Agreement (collectively, the "Claims").

Section 1.02   Reservation of License.   CGD reserves for itself a perpetual and non-exclusive right and license to use (including, without limitation, the right to sublicense, copy, and improve) the Intellectual Property solely as an integrated component of its own fully functional gaming systems. CGD may license the use of the Intellectual Property to third parties solely as an integrated component of CGD's own fully functional gaming systems and only as necessary to continue its existing business operations of licensing fully functional gaming systems. In no event and under no circumstance shall CGD have the right to license, assign, or otherwise convey the use of, or any right to, the Intellectual Property (i) to any individual or entity that directly or indirectly, owns, licenses, develops, or otherwise utilizes software known as the "Legacy System" or any component or derivative of the Legacy System, (ii) to Epic Tech, LLC, its predecessors, successors, affiliates, subsidiaries, agents, owners, members, employees including, but not limited to, Eric Nordin, Bob Mosely, Red Rock Investments LLC and Gateway Gaming LLC, (iii) to any entity directly or indirectly owned, controlled or operated by Epic Tech, LLC, its predecessors, successors, affiliates, subsidiaries, agents, owners, members, employees including, but not limited to, Eric Nordin, Bob Mosely, Red Rock Investments LLC, and Gateway Gaming LLC, or (iv) for use in or as a component of the "Legacy System" or any component or derivative of the Legacy System.

Section 1.03    Payment to CGD.  In exchange for the foregoing assignments, as well as other good and valuable consideration that is hereby acknowledged, Arno hereby agrees to pay to CGC the total sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) within 4 months following the execution of this Agreement.

Section 1.04    Expenses of Enforcement.  With the assignment of the Intellectual Property to Arno, Arno assumes the obligation, at is discretion, of defending and enforcing the Intellectual Property against infringement.  Arno will, at its sole expense, bear all costs of such enforcement, including, without limitation, litigation costs and attorney fees.

## ARTICLE 2
## REPRESENTATIONS, WARRANTIES, AND GUARANTIES

Section 2.01    Representations, Warranties, and Guaranties.  By and through his signature below, David Hampe, an individual resident of the State of Texas ("Hampe"), and the sole owner, member and principal of CGD, is executing this Agreement in his individual capacity and on behalf of CGD, and hereby fully, unconditionally and irrevocably represents, warrants, and guarantees on his behalf and that of CGD to Arno that CGD is the sole owner of all of the Intellectual Property identified in Exhibit A and that neither he personally, nor any other entity that he is associated with owns any intellectual property rights associated therewith.  Hampe also hereby fully, unconditionally and irrevocably represents, warrants, and guarantees on his behalf and that of CGD that CGD is the sole owner of all the Claims and that no Claim has been assigned, conveyed or sold, in part or in its entirety, to any other person.

Section 2.02    Reliance.  The parties agree that Arno is relying on the representations, warranties, and guarantees set forth in Section 2.01 in entering into this Agreement.

## ARTICLE 3
## MISCELLANEOUS

Section 3.01    Nature of Relationship.  Nothing herein shall be construed to place the parties in a relationship of partners or joint venturers and this Agreement does not make either party the agent or legal representative of the other for any purpose whatsoever.  Neither party shall be responsible for any act or omission of the other or any employee of the other.

Section 3.02    Waiver and Amendment.  No amendment to this Agreement shall be effective unless it has been executed in writing by each of the parties, and no waiver of any provision of this Agreement shall be effective unless it has been executed in writing by the party giving such waiver.  Neither the failure of any party hereto to exercise any right, power or remedy provided under this Agreement where otherwise available in respect hereof at Law, in equity, by statute or otherwise, or to insist upon compliance by the other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof, shall constitute a waiver by such party of its right to exercise any such right, power or remedy or to demand such compliance.

Section 3.03    Notices.  All notices, demands and requests required or permitted to be given under this Agreement shall be (a) in writing, (b) sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows: If to CGD:

> Custom Game Design, Inc.
> Attn:  David Hampe
> 811 E Plano Pkwy #120, Plano, TX 75074
>
> If to Arno:
>
> Arno Resources, LLC.
> ATTN: Arno Company, LLC, Manager
> P.O. Box 342141
> Austin, TX 78734

Section 3.04    Descriptive Headings; Interpretation.  The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Agreement.  As used in this Agreement, the terms "include," "includes" and "including" are deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of like import.  Words of one gender shall be held to include the other gender as the context requires.

Section 3.05    Entire Agreement.  This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all other prior discussions and agreements with respect to the subject matter hereof.

Section 3.06    Governing Law.  This Agreement shall be governed, construed and enforced in accordance with the internal Laws of the State of Texas, without regard to any conflict of Law provisions thereof.

Section 3.07    Severability.  If any term or other provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

Section 3.08    Counterparts.  This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.  This Agreement shall become effective when one or more counterparts have been signed by the parties hereto and delivered to the other parties, it being understood that the parties need not sign the same counterpart.  Facsimile signatures or signatures received as a portable document format (PDF) attachment to electronic mail shall be treated as original signatures for all purposes hereunder.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.


**ARNO RESOURCES, LLC**                    **CGD:**

By: Arno Company, LLC                      CUSTOM GAME DESIGN, INC.


_____          _____
Richard Schappel, Manager                  David Hampe
                                           Individually and as President of CGD

## Exhibit A

Non-Exhaustive List of Purchased Intellectual Property

1.     All trademarks, goodwill associated with the trademarks, trade secrets, copyrights, source code, object code, and other intellectual property that resulted from or are associated with the execution or performance of the August 13, 2004 Development Agreement between Gateway Gaming, LLC and CGD[1], aside from those that Gateway Gaming, LLC may own pursuant to section 8 of the Development Agreement.

2.     All of the intellectual property and associated rights that were licensed to Gateway Gaming, LLC pursuant to section 8 of the August 13, 2004 Development Agreement between Gateway Gaming, LLC and CGD.

---

[1] The Development Agreement is attached hereto as Exhibit A-1.

# EXHIBIT 4

**Justin B. Kaplan, Esq.**
Partner
*jkaplan@DFKfirm.com*



May 13, 2020

**VIA FedEx**
Epic Tech, LLC
c/o Paracorp Incorporated
279 W. Crogan St.
Lawrenceville, GA 30046

### RE:   *Unauthorized use of Legacy System Software*

To Whom it May Concern:

This law firm and Brodsky Fotiu-Wojtowicz, PLLC, have been retained by Arno Resources, LLC, to pursue claims against Epic Tech, LLC, and others for their unauthorized use of certain software that our client's predecessor in interest, Custom Game Design, Inc., licensed to Gateway Gaming, Inc. Epic Tech and its putative co-defendants have profited greatly from such unauthorized use. We enclose a copy of the draft Complaint for your review.

While our client intends to pursue all remedies at law and equity against all parties named in the Complaint—as well as others it may learn of through discovery such as the ultimate end-users—our client has authorized us to discuss potential settlement possibilities with all parties before filing suit in an effort to resolve this matter pre-suit. To that end, we request that you have Epic Tech's attorneys contact us no later than May 22, 2020, should it wish to discuss a potential pre-suit settlement.

Very Truly Yours,

*/s/     Justin B. Kaplan*
Justin B. Kaplan, Esq.

Cc:  Benjamin Brodsky, Esq.

Enc.

Miami| 777 Brickell Avenue • Suite 630 • Miami, FL 33131 • (t) 305.569.9800 • (f) 866.569.0666
New York| 845 Third Avenue • 6th Floor • New York, NY 10022 • (t) 212.734.3330 • (f) 866.734.4331
*www.Dfkfirm.com*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

Case No.: _____

ARNO RESOURCES, LLC,

     Plaintiff,

v.

EPIC TECH, LLC, FRONTIER SOFTWARE
SYSTEMS, LLC, RED ROCK INVESTMENTS,
LLC, CRIMSON SKY, LLC, CRIMSON SKY II,
LLC, WINTER SKY, LLC, BOB MOSLEY, SR.,
BOB MOSLEY, JR., STARITA MOSLEY,
J. MICHAEL CALDWELL, TIM CALDWELL,
and ERIK NORDIN,

     Defendants.

_____/

## COMPLAINT

Plaintiff Arno Resources, LLC, by and through undersigned counsel, sues Defendants Epic

Tech, LLC, Frontier Software Systems, LLC, Red Rock Investments, LLC, Crimson Sky, LLC,

Crimson Sky II, LLC, and Winter Sky, LLC, Bob Mosley, Sr., Bob Mosley, Jr., Starita Mosley, J.

Michael Caldwell, Tim Caldwell, and Erik Nordin (collectively, the "Defendants"), and alleges:

### PARTIES, JURISDICTION AND VENUE

1.     Arno Resources, LLC ("Arno Resources" or "Plaintiff"), is a limited liability

company existing by virtue of the laws of the State of Texas.  Each of its members is a citizen of

the State of Texas.

2.     Epic Tech, LLC ("Epic Tech"), is a limited liability company existing by virtue of

the laws of the State of Delaware that has its principal place of business in the State of Georgia.

Upon information and belief, none of the members of Epic Tech are citizens of the State of Texas.

3.      Frontier Software Systems, LLC ("Frontier"), is a limited liability company existing by virtue of the laws of the State of Delaware that has its principal place of business, on information and belief, in the State of Georgia. Upon information and belief, none of the members of Frontier are citizens of the State of Texas.

4.      Red Rock Investments, LLC ("Red Rock"), is a limited liability company existing by virtue of the laws of the Wyoming that has its principal place of business located in the State of Georgia. Upon information and belief, none of the members of Red Rock are citizens of the State of Texas.

5.      Crimson Sky, LLC ("Crimson Sky"), is a limited liability company existing by virtue of the laws of the State of Delaware that has its principal place of business in the State of Georgia. Upon information and belief, none of the members of Epic Tech are citizens of the State of Texas.

6.      Crimson Sky II, LLC ("Crimson Sky II"), is a limited liability company existing by virtue of the laws of the State of Delaware that has its principal place of business in the State of Georgia. Upon information and belief, none of the members of Epic Tech are citizens of the State of Texas.

7.      Winter Sky, LLC ("Winter Sky"), is a limited liability company existing by virtue of the laws of the State of Delaware that has its principal place of business in the State of Georgia. Upon information and belief, none of the members of Epic Tech are citizens of the State of Texas.

8.      Bob Mosley, Sr. ("Mosley Sr."), is an individual over the age of eighteen who is a citizen of the State of Florida or State of South Carolina, and is otherwise *sui juris.*

2

9. Bob Mosley, Jr. ("Mosley Jr."), is an individual over the age of eighteen who is a citizen of the State of South Carolina, and is otherwise *sui juris*. Upon information and belief, he is a director or officer of Epic Tech, Frontier, Crimson Sky, Crimson Sky II, and Winter Sky.

10. Starita Mosley ("S. Mosley") is an individual over the age of eighteen who is a citizen of the State of Florida or State of South Carolina, and is otherwise *sui juris*. She is a director or officer of Red Rock.

11. J. Michael Caldwell ("J.M. Caldwell") is an individual over the age of eighteen who is a citizen of the State of South Carolina, and is otherwise *sui juris*. He is also a director or officer of Red Rock.

12. Tim Caldwell ("T. Caldwell") is an individual over the age of eighteen who is a citizen of the State of South Carolina, and is otherwise *sui juris*. Upon information and belief, he is a director or officer of Epic Tech, Frontier, Crimson Sky, Crimson Sky II, and Winter Sky.

13. Erik Nordin ("Nordin") is an individual over the age of eighteen who, on information and belief, is a citizen of the State of Georgia, and is otherwise *sui juris*. Upon information and belief, he is a director or officer of Epic Tech, Frontier, Crimson Sky, Crimson Sky II, and Winter Sky.

14. This Court has personal jurisdiction over Defendants because each is either a citizen of Georgia, has transacted business within Georgia; has committed a tortious act within the State of Georgia; has conspired with citizens of the State of Georgia and purposefully directed acts in furtherance of that conspiracy to the State of Georgia or caused damage in the State of Georgia as set forth herein; owns, uses or possess real property situated in the State of Georgia; has solicited business, or engaged in any other persistent course of conduct in the State of Georgia; or derives substantial revenue from goods used or consumed or services rendered in the State of Georgia.

3

15.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the amount in controversy is in excess of $75,000, exclusive of interest and costs, and the parties are citizens of different states.

16.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391 because the Defendants reside in this judicial district or because a substantial part of the events of omissions giving rise to the claims occurred in this judicial district.

## GENERAL ALLEGATIONS

### I.     *Agreement Between Customs Game Design, Inc. and Gateway Gaming, Inc.*

17.     Customs Game Design, Inc. ("CGD"), at all times material to this case, was and is a computer software engineering, design, applications and back-end source code for gaming software programs comprised of, without limitation, a server, management terminal, and cashier terminal.

18.     Gateway Gaming, Inc. ("Gateway Gaming") is a now-dissolved gaming company that was owned and controlled by Mosley, Sr., and J.M. Caldwell ("Gateway Gaming's Principals"), as well as others. It was incorporated on or about August 12, 2004.

19.     On or about August 13, 2004, CGD and Gateway Gaming entered into a Development Agreement (the "Development Agreement"), which is attached hereto as Exhibit A.

20.     Under the Development Agreement, CGD agreed to utilize its expertise to create gaming applications in exchange for tiered payments from Gateway Gaming. These gaming applications would and were in fact used in terminals or game stations in physical locations in Georgia and throughout the United States. These terminals or game stations would present digital promotional games, which individuals would pay to play. These physical game stations would

4

then connect to servers running proprietary software owned exclusively by CGD. This is referred to herein as the "back-end" software.

21.     To allow the games to fully function, Gateway Gaming received a non-transferrable perpetual worldwide license to utilize CGD's proprietary game terminal and back-end software required to operate the promotional gaming applications. The game terminal and "back-end" software included, without limitation:    (a) the central server software that "played" the games, recorded the results, and sent the results to the game terminals, along with other related software that processes and tracked players' monetary transactions; (b) the game terminal that included bill accepter software, card reader software, security software that monitored switches on the game terminal, video software that displayed and animated the related graphic scheme and communications to the central server; (c) management terminal software that would configure the system and generate necessary monetary and usage reports; and (d) cashier terminal software that calculated deposits and payments of monies to users of the software developed by CGD (collectively, the "Software").

22.     The Development Agreement specifically allocated ownership of the intellectual property created under its terms, as set forth under Sections 8 of the Development Agreement, which provided as follows:

> **INTELLECTUAL PROPERTY.** The Client shall own the intellectual property rights related to game pay tables, game graphics and the game DLL software. (collectively referred to hereinafter as the "Game Related Pieces"); including all copyrights, trademarks, patents, and documentation for the Game Related Pieces. The Client will also receive a worldwide license to use and modify all source code and documentation for all items exclusive of the Game Related Pieces.

23.     The Development Agreement thereby conveyed ownership of intellectual property rights, including all copyrights, patents and documentation, related only to: (a) "game pay tables"

5

or pay tables, (b) "graphics," and (c) the "game DLL software," collectively referred to therein as the "Game Related Pieces."

24.     At the same time, CGD retained ownership of any and all other source code and software, including without limitation the Software and, of particular importance here, the software that interfaces with the "game pay tables," "graphics" and/or "game DLL software."

25.     The worldwide license was non-exclusive, non-transferable, and did not authorize Gateway to sub-license, sell or distribute the source code or Software to any third party, without written consent from CGD.   This made clear in Section 8 and, moreover, Section 19 of the Development Agreement:

**ASSIGNMENT.   This Agreement may not be assigned by either party without the written consent of the other party hereto.**

(Ex. A at § 19.)

26.     CGD timely finished creating the promotional gaming applications.

**II.     *Gateway Gaming Indictment and Improper Assignment***

27.     CGD invested significant money and goodwill to develop, modify and refine the software which was licensed to Gateway Gaming.

28.     From 2004 through 2012, CGD permitted Gateway Gaming to use its worldwide license under the terms of the Development Agreement.

29.     Initially, Gateway Gaming was the only licensee of the system and Software; and CGD transmitted updates as the development progressed pursuant to the terms of the Development Agreement.

30.     As it was permitted to do, CGD also licensed this Software to others in addition to Gateway Gaming in exchange for a percentage of revenue derived from gaming machines.   These

6

third parties would receive an executable system and would not obtain the source code or right to sublicense CGD's Software.

31.     Gateway Gaming was dissolved on January 1, 2013.

32.     In August 2013, Gateway Gaming and Gateway Gaming's Principals were indicted in the United States District Court for the District of South Carolina for money laundering and illegal gambling; to which they pleaded.

33.     Sometime thereafter, Gateway Gaming's Principals caused Gateway Gaming to transfer Gateway Gaming's assets to Red Rock—including the non-transferrable license to use the Software—which then purportedly transferred same to Epic Tech and Frontier. Red Rocks, Epic Tech, and Frontier, as well as on information and belief Crimson Sky, Crimson Sky II, Winter Sky (collectively, the "Corporate Defendants") are companies owned and controlled by Gateway Gaming's Principals or their family members, including without limitation S. Mosley, T. Caldwell, Mosley, Jr., and Nordin.

34.     The assignments constituted a fraudulent scheme by which Gateway Gaming's Principals could and did continue to profit off of CGD's Software, with the assistance of their family members and close associates, despite being prohibited from assigning Gateway Gaming's license therein.

35.     This assignment would include the Game Related Pieces, or intellectual property rights, including all copyrights, patents and documentation, related to: (a) "game pay tables" or pay tables, (b) "graphics," and (c) the "game DLL software," or the source code developed exclusively to display the game on the game terminal, under the Development Agreement.

36.     Despite the foregoing, when referencing the Software in court-filings in the United States District Court for the Middle District of North Carolina and in sworn answers to

7

interrogatories, Epic Tech (through Nordin) represented that "in or about 2004," Red Rock "developed a server-based, electronic sweepstakes software system known as 'Legacy' that has been used across the United States where permitted by law," as well as that Epic Tech purchased the Software from Red Rock on or about September 17, 2014.

37.     Red Rock, however, could not have developed the Software; and Red Rock, Epic Tech, and their respective principals knew the foregoing representations to be false when made.

38.     Red Rock was originally named Gateway Systems, LLC. It was organized under the laws of the State of Delaware on August 6, 2012—eight years after it purportedly developed the Software—then continued its existence as a Wyoming company on January 28, 2013, and changed its name to Red Rock on September 9, 2013.

39.     In reality, Epic Tech, with the other Defendants' substantial assistance, concocted the Software's fictitious origin story in order to pass of the Software as Epic Tech's and thus defrauding the entire market.

40.     Neither Red Rocks nor Epic Tech (and certainly the other Corporate Defendants) could obtain an assignment of any rights under the Development Agreement absent written consent from CGD. Neither Red Rock nor Epic Tech or the other Corporate Defendants, therefore, obtained any right to Gateway Gaming's "worldwide license to use and modify all source code and documentation" related to the Software or software required to operate the game terminals, including but not limited to the central server, game terminals, management terminals, and cashier terminals, or what Gateway Gaming was calling the "Legacy System."

41.     Nonetheless, upon information and belief, to this day, the Corporate Defendants continue to unlawfully use the Software and source code developed, written and licensed by CGD

8

in the United States and Europe without authorization, without license and without paying CGD any royalty or otherwise compensating CGD for the use of the source code and Software.

42.     Even worse, upon information and belief, the Corporate Defendants are unlawfully themselves licensing the CGD Software and source code to other third parties – for their own financial benefit – without obtaining CGD's consent and without paying CGD any compensation for the continued unlawful use of CGD's proprietary Software.

43.     In doing so, the Corporate Defendants are "passing off" CGD's Software and source code to other third parties as if it is their own intellectual property, thereby causing confusion or misunderstanding as to the source of CGD's Software and source code and representing that such software and source code has characteristics, uses, benefits or quantities that it does not have.  These acts are willfully and knowingly deceptive and constitute material misrepresentations.

**III.    *Assignment from CGD to Arno Resources.***

44.     On February 28, 2017, CGD entered into a software assignment agreement with Arno Resources (the "Software Assignment Agreement"), which is attached hereto as Exhibit B.

45.     Pursuant to the Software Assignment Agreement, CGD granted, conveyed and assigned to Arno Resources all rights, title and interest to the intellectual property including those listed in Exhibit A to the Software Assignment Agreement.

46.     This included all intellectual property and associated rights arising in connection with the Development Agreement, which also includes but is not limited to intellectual property and associated rights that were licensed to Gateway Gaming under Section 8 of the Development Agreement, as set forth in Exhibit A thereto:

## Exhibit A

### Non-Exhaustive List of Purchased Intellectual Property

1.  All trademarks, goodwill associated with the trademarks, trade secrets, copyrights, source code, object code, and other intellectual property that resulted from or are associated with the execution or performance of the August 13, 2004 Development Agreement between Gateway Gaming, LLC and CGD[1], aside from those that Gateway Gaming, LLC may own pursuant to section 8 of the Development Agreement.

2.  All of the intellectual property and associated rights that were licensed to Gateway Gaming, LLC pursuant to section 8 of the August 13, 2004 Development Agreement between Gateway Gaming, LLC and CGD.

47.     As the owner of all "intellectual property that resulted from or are associated with the execution or performance of the August 13, 2004 Development Agreement between Gateway gaming, LLC and CGD", Arno Resources is entitled to assert the claims against Epic Tech set forth herein.

## IV.   *Discovery of Wrongful Conduct and Statute of Limitations.*

48.     CGD first learned of the aforementioned unlawful conduct in late 2016/early 2017, when one of CGD's clients uncovered materials produced through discovery *by Epic Tech* in *Epic Tech, LLC v. STHR Group, LLC, et al.,* Case No. 1:15-cv-252 (M.D. N.C.), which showed that Epic Tech was using and licensing CGD's source code and proprietary Software under the name the "Legacy System."

49.     The "Legacy System" includes significant portions of code that are identical to CGD's source code and proprietary Software.  In addition, the "Legacy System" includes specific references to CGD, which would not be present absent copying the source code and proprietary software that belonged entirely to CGD and now Arno Resources.

50.     The Corporate Defendants fraudulently concealed the misconduct including by, among other things, willfully concealing and refusing to disclose to CGD or third parties that it and the other Corporate Defendants were unlawfully using CGD's intellectual property, secretly

10

licensing CGD's intellectual property to third parties while representing that the source code and Software belonged to Epic Tech and its Corporate Defendants, and deriving financial gain from concealing its theft, conversion, fraud and unlawful use of CGD's intellectual property. Any applicable statute of limitations is therefore tolled.

51.    In addition, as set forth herein, the Corporate Defendants are continuing to wrongfully use Arno Resource's intellectual property without any license or legal right to do so. Accordingly, the continuing tort doctrine applies and Plaintiff can recover for any and all damages suffered within the applicable limitations periods preceding filing of the instant lawsuit.

52.    All conditions precedent to this action have been waived, performed, or otherwise excused.

53.    Arno Resources has retained the undersigned law firms to represent it in this matter, and has agreed to pay the fees and costs associated therewith.

### COUNT I
### COMMON LAW UNFAIR COMPETITION

Arno Resources realleges and incorporates the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

54.    The Corporate Defendants used and continues to use intellectual property owned exclusively by Arno Resources and its predecessor in interest, CGD, including but not limited to Arno Resources' Software or source code pertaining to the central server, game terminals, management terminals, and cashier terminals without a license or any legal right to use such software or source code.

55.    In addition, upon information and belief, the Corporate Defendants then licensed or otherwise distributed Arno Resources' and its predecessor in interest, CGD's, intellectual

11

property, including but not limited to the software or source code set forth in Paragraph 40 of this Complaint, to other third parties.

56.    In doing so, the Corporate Defendants further misrepresented to third parties that such intellectual property belonged to, or was otherwise designed, created and/or developed by one or more of them. In fact, the Corporate Defendants represented that Arno Resources' intellectual property, including but not limited to the Software or source code described herein constituted their own "Legacy System" software.

57.    These representations were both deceiving and false and, further, constituted passing off, or attempting to pass off, on the public, the goods or business of one person as and for the goods or business of another.

58.    The Corporate Defendants deception and misrepresentation by means of "passing off" CGD's source code and software as their own intellectual property (a) caused confusion and misunderstanding as to the source of CGD's software and source code and (b) misrepresented that the subject source code and software had characteristics, uses, benefits and/or qualities that it did not in fact have.

59.    The Corporate Defendants, and their principals, officers, and directors, engaged in each of these unlawful acts with willful misconduct, malice, fraud, wantonness, oppression and the entire want of care which would raise the presumption of conscious indifference to consequences.

60.    The Corporate Defendants benefited from the unlicensed and unlawful use of Arno Resources' intellectual property, including but not limited to the Software or source code described herein, by obtaining the benefit of unlimited use of Arno Resources' intellectual property without license or legal authority, receiving royalties from third parties after the Corporate Defendants

12

licensed the "Legacy System" and acquiring corporate opportunities, business deals and opportunities to expand its business and revenue, which would not have occurred but their unfair business practices. The Corporate Defendants further derived unlawful benefits from the skills, expenditures and labor of Arno Resources through its predecessor in interest, CGD.

61.     As a direct and proximate result of the foregoing, Arno Resources has suffered actual and special damages including without limitation, lost licensing fees, lost profits, loss of market share, and loss of goodwill.

62.     Each of the Corporate Defendants' officers and directors, including J.M. Caldwell, Mosley, Jr., S. Mosley, T. Caldwell, and Nordin personally orchestrated, directed, or willfully participated in the aforementioned tortious conduct and accordingly may be held liable therefore.

## COUNT II
## UNFAIR COMPETITION UNDER O.C.G.A. § 23-3-55, *et seq.*

Arno Resources realleges and incorporates the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

63.     The Corporate Defendants used and continued to use intellectual property owned exclusively by Arno Resources and its predecessor in interest, CGD, including but not limited to Arno Resources' Software or source code pertaining to the central server, game terminals, management terminals, and cashier terminals without a license or any legal right to use such software or source code.

64.     In addition, upon information and belief, the Corporate Defendants then licensed or otherwise distributed Arno Resources' and its predecessor in interest, CGD's, intellectual property, including but not limited to the Software or source code as described herein, to other third parties.

13

65.     In doing so, the Corporate Defendants further misrepresented to third parties that such intellectual property belonged to, or was otherwise designed, created and/or developed by one of the Corporate Defendants.  In fact, the Corporate Defendants represented that Arno Resources' intellectual property, including but not limited to the Software or source code described herein, constituted their own "Legacy System" software.

66.     These representations were both deceiving and false and, further, constituted passing off, or attempting to pass off, on the public, the goods or business of one person as and for the goods or business of another.

67.     The Corporate Defendants' deception and misrepresentation by means of "passing off" CGD's source code and Software as their own intellectual property (a) caused confusion and misunderstanding as to the source of CGD's software and source code and (b) misrepresented that the subject source code and software had characteristics, uses, benefits and/or qualities that it did not in fact have.

68.     The Corporate Defendants knew that the intellectual property described in herein, including without limitation the Software and its source code, constituted property of Arno Resources and its predecessor in interest, CGD.  Moreover, the Corporate Defendants' actions were knowing and intentional attempts to encroach upon the business of Arno Resources and its predecessor in interest, CGD and deceiving and misleading the public.

69.     Accordingly, the Corporate Defendants engaged in each of these unlawful acts with willful misconduct, malice, fraud, wantonness, oppression and the entire want of care which would raise the presumption of conscious indifference to consequences.

70.     The Corporate Defendants benefited from the unlicensed and unlawful use of Arno Resources' intellectual property, including but not limited to the Software or source code described

14

herein, by obtaining the benefit of unlimited use of Arno Resources', intellectual property without license or legal authority, receiving royalties from third parties after they licensed the "Legacy System" and acquiring corporate opportunities, business deals and opportunities to expand their business and revenue, which would not have occurred but for their unfair business practices. The Corporate Defendants further derived unlawful benefits from the skills, expenditures and labor of Arno Resources through its predecessor in interest, CGD.

71.     As a direct and proximate result of the foregoing, Arno Resources has suffered actual and special damages including without limitation, lost licensing fees, lost profits, loss of market share, and loss of goodwill.

72.     Each of the Corporate Defendants' officers and directors, including J.M. Caldwell, Mosley, Jr., S. Mosley, T. Caldwell, and Nordin personally orchestrated, directed, or willfully participated in the aforementioned tortious conduct and accordingly may be held liable therefore.

## COUNT III
### UNJUST ENRICHMENT
(Against Only the Corporate Defendants)

Arno Resources realleges and incorporates the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

73.     The Corporate Defendants used and continues to use intellectual property owned exclusively by Arno Resources and its predecessor in interest, CGD, including but not limited to Arno Resources' Software or source code without a license or any legal right to use such Software or source code.

74.     In addition, upon information and belief, the Corporate Defendants then licensed or otherwise distributed Arno Resources' and its predecessor in interest, CGD's, intellectual

15

property, including but not limited to the Software or source code as described herein, to other third parties.

75. In doing so, the Corporate Defendants misrepresented to third parties that such intellectual property belonged to, or was otherwise designed, created and/or developed by the Corporate Defendants represented that Arno Resources' and its predecessor in interest, CGD's, intellectual property, including but not limited to the Software or source code described herein, constituted their own "Legacy System" software.

76. Arno Resources conferred a benefit on the Corporate Defendants as their unlicensed and unlawful use of Arno Resources' and its predecessor in interest, CGD's, intellectual property, including but not limited to the Software or source code as described herein, resulted in the Corporate Defendants' unlimited use of Arno Resources' intellectual property without license or legal authority, receiving royalties from third parties the Corporate Defendants licensed the "Legacy System" and acquiring corporate opportunities, business deals and opportunities to expand its business and revenue, which would not have occurred but for the Corporate Defendants' use of Arno Resources' intellectual property.

77. The Corporate Defendants also acquired the benefit of the skills, expenditures and labor of Arno Resources through its predecessor in interest, CGD, without having to pay for training, research and development, or any of the other costs incurred by Arno Resources or its predecessor in interest, CGD, in developing such intellectual property.

78. Accordingly, the Corporate Defendants have obtained the benefit of Arno Resource's goodwill, research and development, source code, Software and other intellectual property by marketing the intellectual property created by Arno Resource's predecessor in interest,

16

CGD, and using such goodwill, research and development, source code, Software and other intellectual property to generate revenue and entice customers.

79.     The Corporate Defendants have provided no compensation to Arno Resources for the value of the product or services conferred by Arno Resources and its predecessor in interest, CGD, on the Corporate Defendants by virtue of Arno Resources' or CGD's unknowing conferral of its goodwill, research and development, source code, Software and other intellectual property on the Corporate Defendants.

80.     The failure of the Corporate Defendants to fairly compensate Arno Resources would result in grave injustice to Arno Resources.

## COUNT IV
## VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT

Arno Resources realleges and incorporates the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

81.     The Corporate Defendants engaged in deceptive trade practices when they used intellectual property owned exclusively by Arno Resources and its predecessor in interest, CGD, including but not limited to Arno Resources' Software or source code pertaining to the central server, game terminals, management terminals, and cashier terminals without a license or any legal right to use such Software or source code.

82.     In addition, upon information and belief, the Corporate Defendants then licensed or otherwise distributed Arno Resources' and its predecessor in interest, CGD's, intellectual property, including but not limited to the Software or source code described herein, to other third parties.

83.     In doing so, the Corporate Defendants further misrepresented to third parties that such intellectual property belonged to, or was otherwise designed, created and/or developed by the

17

Corporate Defendants. In fact, the Corporate Defendants represented that Arno Resources'
intellectual property, including but not limited to the software or source code described herein,
constituted their own "Legacy System" software.

84. These representations were both deceiving and false and, further, constituted
passing off, or attempting to pass off, on the public, the goods or business of one person as and for
the goods or business of another.

85. The Corporate Defendants deception and misrepresentation by means of "passing
off" CGD's source code and Software as their own intellectual property (a) caused confusion and
misunderstanding as to the source of CGD's Software and source code and (b) misrepresented that
the subject source code and software had characteristics, uses, benefits and/or qualities that it did
not in fact have.

86. These actions constituted deceptive trade practices by, among other things:

> (a) Using, distributing and licensing Arno Resources' and its
> predecessor in interest, CGD's, intellectual property without
> authorization;

> (b) Passing off Arno Resources' and its predecessor in interest, CGD's,
> intellectual property as belonging to Epic Tech;

> (c) Causing likelihood of confusion or of misunderstanding as to the
> source, sponsorship, approval, or certification of Arno Resources'
> and its predecessor in interest, CGD's, intellectual property;

> (d) Causing likelihood of confusion or of misunderstanding as to
> affiliation, connection, or association with or certification of Arno
> Resources' and its predecessor in interest, CGD's, intellectual
> property;

> (e) Misrepresenting that Arno Resources' and its predecessor in interest,
> CGD's, intellectual property is of a particular standard, quality, or
> grade or that goods are of a particular style or model; and

18

(f) Engaging in conduct which similarly creates a likelihood of confusion or of misunderstanding, to be discovered during the course of litigation.

87.     The Corporate Defendants willfully engaged in each of these deceptive trade practices, with full knowing that its trade practices were deceptive.

88.     In addition, the Corporate Defendants benefited from the unlicensed and unlawful use of Arno Resources' and its predecessor in interest, CGD's, intellectual property, including but not limited to the Software or source code described herein, by obtaining the benefit of unlimited use of Arno Resources' and its predecessor in interest, CGD's, intellectual property without license or legal authority, receiving royalties from third parties after the Corporate Defendants licensed the "Legacy System" and acquiring corporate opportunities, business deals and opportunities to expand its business and revenue, which would not have occurred but the Corporate Defendants' unfair business practices.

89.     As a direct and proximate result of the foregoing, Arno Resources has suffered actual and special damages including without limitation, lost licensing fees, lost profits, loss of market share, and loss of goodwill.

90.     Each of the Corporate Defendants' officers and directors, including J.M. Caldwell, Mosley, Jr., S. Mosley, T. Caldwell, and Nordin personally orchestrated, directed, or willfully participated in the aforementioned tortious conduct and accordingly may be held liable therefore.

## COUNT V
## CIVIL CONSPIRACY
(Against only Mosley, Sr., Mosley, Jr., S. Mosley, J.M. Caldwell, T. Caldwell, and Nordin)

Arno Resources realleges and incorporates the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

19

91.     When Gateway Gaming's Principals were indicted and Gateway Gaming ceased as a going concern, none of the Defendants should have had the opportunity to use, license, or profit in any manner from the Software; and they did not have the legal right to do so.

92.     Nonetheless, Mosley, Sr., Mosley, Jr., S. Mosley, J.M. Caldwell, T. Caldwell, Nordin (collectively, the "Individual Defendants"), and possibly others, engaged in a conspiracy to unlawfully profit from the unauthorized use of the Software despite Gateway Gaming's Principals having been indicted and Gateway Gaming ceasing to exist as a going concern.

93.     In furtherance of the conspiracy, the Individual Defendants collectively orchestrated and carried out a scheme to create or use various corporate entities—the Corporate Defendants and likely others unknown at this time—and, except for Mosley Sr., were and are officers or directors of such entities.

94.     The conspiracy was and continues to be primarily centered in and through Epic Tech.

95.     Mosley Sr. and J.M. Caldwell controlled Gateway Gaming and caused it to transfer the Source Code to Epic Tech at its principal place of business in Georgia.

96.     Upon information and belief, in conjunction with her husband, Mosley, Sr., S. Mosley and J.M. Caldwell created Red Rock, are Red Rock's sole members, and on information and belief or agreed to be its officers and directors.

97.     They did so in furtherance of the conspiracy in order to be able for the Defendants to falsely claim that Red Rock had developed the Software and then assigned same to Epic Tech.

98.     Mosley Jr., T. Caldwell, and Nordin are, on information and belief, the only members and are the sole officers and directors of Epic Tech, Crimson Sky, Crimson Sky II, and

20

Winter Sky, and most likely other entities through which the Software has been improperly licensed.

99.     The resultant web of companies allowed the Defendants to directly or indirectly profit from the improper use of the Software, as well as to cause confusion in the market, improperly obtain market share that could have otherwise been obtained by CGD, Arno Resources, or their licensees (which would have resulted in additional revenues for CGD or Arno Resources).

100.    All of these actions occurred when, in fact, Mosley Sr. and J.M. Caldwell controlled Gateway Gaming and used Gateway Gaming to transfer the Software and its source code to Epic Tech at its principal place of business in Georgia.

101.    This conspiracy remains ongoing to this day, as the Individual Defendants use and utilize Epic Tech as the corporate entity through which to further their conspiracy.

102.    As a direct and proximate result of the foregoing, Arno Resources has suffered actual and special damages including without limitation, lost licensing fees, lost profits, loss of market share, and loss of goodwill.

## COUNT VI
### AIDING AND ABETTING BREACH OF
### CONTRACT ACCOMPANIED BY A FRAUDULENT ACT
(Against only Mosley, Sr., Mosley, Jr., S. Mosley, J.M. Caldwell, T. Caldwell, and Nordin)

Arno Resources realleges and incorporates the allegations set forth in Paragraphs 1 through 53 and 91 through 102 as if set forth fully herein.

103.    Gateway Gaming breached its Development Agreement with Arno Resources' predecessor in interest, CGD, by sub-licensing the Software to companies it was affiliated with and that were owned or controlled by Gateway Gaming's Principals or their family members including without limitation the Defendants.

21

104.    Such breach was accomplished with the fraudulent intention of Gateway Gaming, as well as others including without limitation the Defendants, to pass off the Software, its source code, and related intellectual property as the Corporate Defendants'.

105.    Such breach was accompanied be the fraudulent act of Gateway Gaming, the Corporate Defendants, as well as others, passing off the Software, its source code, and related intellectual property as their own.

106.    Each of the Defendants provided substantial assistance in furtherance of Gateway Gaming's fraudulent acts.

107.    As a direct and proximate result of the foregoing, Arno Resources has suffered actual and special damages including without limitation, lost licensing fees, lost profits, loss of market share, and loss of goodwill.

## COUNT VII
## INJUNCTIVE RELIEF

Arno Resources realleges and incorporates the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

108.    Arno resources has suffered and, absent injunctive relief, will continue to suffer irreparable injury by the Corporate Defendants' use of the Software and its source code, as well as similar use by the Corporate Defendants' officers, directors, affiliates, subsidiaries, customers, vendors, and other third-parties who obtain the Software or its source code from the Corporate Defendants.

109.    Arno resources has no remedies available to it at law, such as unknown future monetary damages caused by the Corporate Defendants' continued use of the Software and its source code, as well as similar continued use by the Corporate Defendants' officers, directors,

22

affiliates, subsidiaries, customers, vendors, and other third-parties who have or may in the future obtain the Software or its source code from the Corporate Defendants.

110.    Considering the balance of the hardships between Arno Resources and the Defendants, an equitable remedy is warranted.

111.    The public interest will not be disserved by a permanent injunction enjoining the Corporate Defendants' continued use of the Software and its source code, as well as similar continued use by the Corporate Defendants' officers, directors, affiliates, subsidiaries, customers, vendors, and other third-parties who have or may in the future obtain the Software or its source code from the Corporate Defendants.

## JURY DEMAND

112.    Arno Resources requests a jury for any issue so triable.

**WHEREFORE,** Plaintiff, Arno Resources, LLC, demand judgment against the Defendants for:

      a.    Actual damages in an amount to be determined at trial;

      b.    Consequential or special damages in an amount to be determined at trial;

      c.    Costs;

      d.    Reasonable attorneys' fees to the extent permissible;

      e.    Punitive damages to the extent permissible;

      f.    Permanent Injunctive Relief; and

      g.    Such other and further relief as this Court deems just and proper.

Dated: _____, 2020

23

Respectfully Submitted,

By:    */s/ Justin B. Kaplan*
        Justin B. Kaplan, Esq.
        Florida Bar No. 33725
        Elaine Kussurelis
        Florida Bar No. 1019234
        **DIFALCO FERNANDEZ KAPLAN**
        777 Brickell Avenue, Suite 630
        Miami, Florida 33131
        Tel.: 305-569-9800
        Fax: 866-569-0666
        Jkaplan@dfkfirm.com
        elaine@dfkfirm.com

By:    */s/ Benjamin H. Brodsky*
        Benjamin H. Brodsky, Esq.
        Florida Bar No. 73748
        Joshua Truppman, Esq.
        Florida Bar No. 11795
        **BRODSKY FOTIU-WOJTOWICZ, PLLC**
        *Counsel for Plaintiffs*
        200 SE 1st Street, Suite 400
        Miami, Florida 33131
        Tel: 305-503-5054
        Fax: 786-749-7644
        bbrodsky@bfwlegal.com
        joshua@bfwlegal.com
        docketing@bfwlegal.com

24